UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No.:  3:07-cv-00011 (RJC-DLH)

| | |
|---|---|
| **Elena M. David, Arleen J. Stach,** | ) |
| **Victor M. Hernandez** | ) |
| | ) |
| **Plaintiffs,** | ) |
| v. | ) |
| | ) |
| **J. Steele Alphin,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS

Defendants Bank of America Corporation (the "Bank"), J. Steele Alphin, Amy Woods Brinkley, Edward J. Brown, III, Charles J. Cooley, Richard M. DeMartini, Barbara J. Desoer, James H. Hance, Jr., Kenneth D. Lewis, Liam E. McGee, Eugene M. McQuade, Alvaro G. De Molina, Michael E. O'Neill, Owen G. Shell, Jr., R. Eugene Taylor, F. William Vandiver, Jr., and Bradford H. Warner (collectively "Defendants") respectfully submit this memorandum of law in support of their Motion for Summary Judgment On Statute of Limitations Grounds.

### INTRODUCTION

Plaintiffs' claims are barred by ERISA[1] § 413, 29 U.S.C. § 1113.  That provision requires that any breach of fiduciary duty claim under ERISA be brought within the *earlier* of six years after the alleged breach or three years after a plaintiff acquires actual knowledge of facts giving rise to the breach.

Plaintiffs' principal claims are that Defendants violated ERISA-imposed duties by

---

[1] Employee Retirement Income Security Act of 1974, as amended.

selecting Bank of America-affiliated mutual funds as investment options for the Bank of America 401(k) Plan (the "Plan"). Plaintiffs do not allege that such funds became imprudent or improper over time. Instead, plaintiffs contend that the selections of the funds were from the beginning both *per se* prohibited transactions under ERISA § 406[2] and violations of the duties of prudence and loyalty imposed under ERISA § 404.[3]

These claims cannot survive ERISA's statute of limitations provision. The selections of all but one of the Bank-affiliated mutual funds in the Plan's lineup—and of every affiliated fund in which Plaintiffs themselves have invested—occurred more than six years before the filing of this litigation on August 7, 2006.[4] And the inclusion of those funds in the Plan's lineup has been continuously disclosed to Plan participants, including Plaintiffs, ever since. This dooms Plaintiffs' investment selection claims not only under ERISA § 413(1)─the provision barring fiduciary duty claims asserted more than six years after the alleged breach─but also under ERISA § 413(2)─which independently bars claims asserted more than three years after the Plaintiffs acquired actual knowledge of the breach.

Plaintiffs' remaining claims are similarly barred. Under those claims, Plaintiffs allege that defendants engaged in prohibited transactions and otherwise breached fiduciary duties by causing the Plan to pay Bank entities for providing other Plan services. Yet here again Plaintiffs challenge a service arrangement that has continuously and conspicuously existed since before the six-year limitations period imposed by ERISA. As such, this additional theory is also untimely.

To be clear, untimeliness is not the only flaw in Plaintiff's claims, and Defendants intend, if necessary, to show those claims to be both factually and legally unfounded. It is, however, a

---

[2] 29 U.S.C. § 1106.

[3] 29 U.S.C. § 1104.

[4] *See David v. Alphin, et al.*, No. 06-cv-04763 (N.D. Cal. Aug. 7, 2006), Dkt. #1.

fatal flaw and one that makes the Court's and the parties' continued expenditure of resources on this case unnecessary, particularly in light of recent case law on the issue. Accordingly, Defendants respectfully submit that the Court should grant summary judgment in their favor on grounds that Plaintiffs' claims are barred by the applicable statutes of limitations.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. THE BANK OF AMERICA 401(K) PLAN

1. The Bank of America 401(k) Plan (formerly known as the NationsBank 401(k) Plan) is a profit-sharing savings plan under which participating Bank employees—as permitted by § 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k)—contribute a portion of their pre-tax earnings to the Plan. Those employee contributions are then "matched" in part by separate contributions made to the participants' accounts by the Bank or its affiliates. (The Bank of America 401(k) Plan, as amended effective July 1, 2000 (the "2000 Plan Document"), (BOA-DAVID 00348 at 00353, 00377-81), (attached as Exhibit 1 to the Declaration of Stephen D. Terry ("Terry Decl."); The Bank of America 401(k) Plan, as amended effective January 1, 2006 (the "2006 Plan Document"), (BOA-DAVID 00001 at 00023-25), (Terry Decl., Ex. 4)[5].)

2. Plan participants direct the investment of their respective accounts among a menu of investment options identified in the formal Plan document. (Terry Decl., Ex. 4 (2006 Plan Document at BOA-DAVID 00070-71).)

3. The Bank of America Corporation Corporate Benefits Committee ("CBC") has authority to increase or decrease the number of investments options and to add or terminate

---

[5] The Plans have been modified, amended and restated from time to time, but the relevant terms of the Plans have not been amended in a way that would affect the issues raised in the current motion. Copies of all versions of the Plans that were effective for the six-year period prior to the filing of this action are attached as exhibits to the Declaration of Stephen D. Terry filed in support of Defendants' Motion.

specific funds in the Plan's investment lineup. (Terry Decl., Ex. 4 (2006 Plan Document at BOA-DAVID 00059).)

4. During the late 1990s, the Plan's investment lineup was modified at various times to add several Nations Funds, which were mutual funds managed by NationsBank Corporation─ the Plan's then-sponsor and Bank of America's predecessor in interest—or one of its affiliates. (Declaration of David Andreasen ("Andreasen Decl."), Ex. 1 (chart identifying fund lineup and changes).)

5. As of July 1, 2000, the Plan's investment lineup consisted of the Bank of America Company Stock Fund, the Stable Capital Fund, and ten (10) Nations Funds: Nations LifeGoal Income and Growth Portfolio; Nations LifeGoal Balanced Growth Portfolio; Nations LifeGoal Growth Portfolio; Nations Investment Grade Bond Fund; Nations Value Fund; Nations International Equity Fund; Nations Marsico Focused Equities Fund; Nations LargeCap Index Fund; Nations MidCap Index Fund; and Nations SmallCap Index Fund. (Terry Decl., Ex. 1 (2000 Plan Document at BOA-DAVID 00427).)

6. Since that time, the names of a number of the funds have changed (primarily to be identified as "Columbia" funds), but only one Bank-affiliated mutual fund—the Columbia Quality Plus Bond Fund—has been added to the Plan's lineup. (Andreasen Decl., Ex. 1 (chart identifying fund lineup and changes).) That fund was introduced to the Plan's lineup in December 2004 as a replacement for the Nations Bond Fund. (*Id.*)[6]

7. However, since July 2000 the CBC has added several funds to the Plan's lineup that have no affiliation with the Bank. Such unaffiliated funds include the Batterymarch U.S. Small Cap Equity Fund, Dodge & Cox Stock Fund, Vanguard Total Stock Market Index Fund,

---

[6] The Columbia Quality Plus Bond Fund was later renamed the Columbia Core Bond Fund. (Andreasen Decl., Ex. 1 (chart identifying fund lineup and changes).)

Growth Fund of America, Fidelity Diversified International Equity Fund, Western Asset Core Bond Fund, Fidelity Real Estate Investment Fund, a series of BGI LifePath Funds, and the Vanguard Treasury Inflation Protected Securities Fund. (Andreasen Decl., Ex. 1 (chart identifying fund lineup and changes)).

8. In addition to the investment management services provided through the Plan's investment options, the Plan also requires a variety of administrative services, such as recordkeeping and trustee services. Although the Plan has acquired some services from outside vendors, the Bank has also performed some Plan administrative services internally since at least 1998. (*See, e.g.*, Form 5500 for plan year 2000 ("2000 Form 5500"), (attached as Exhibit 1 to the Declaration of Shannon M. Barrett ("Barrett Decl.") at Schedule C, BOA-DAVID2-00138930-39; *see also* Barrett Decl., Ex. 2 (Forms 5500 for plan years 1998-2006) at Schedules C.)

9. During that time frame, the Bank has sought and obtained payment from the Plan for expenses incurred by the Bank in rendering Plan administrative services. (Barrett Decl., Ex. 2 (Forms 5500 for plan years 1998-2006) at Schedules C.)

10. Since at least 1998, the Bank's status as a Plan service provider and the amounts the Plan pays the Bank for Plan administrative services have been disclosed to the Internal Revenue Service and Department of Labor on an annual basis in Schedules C to publicly available regulatory filings known as Form 5500s. (*Id.*)

## II. PLAINTIFFS' PARTICIPATION IN THE PLAN

11. Plaintiff Elena M. David participated in the Plan since at least the mid-1990s. (Barrett Decl., Ex. 10 (Deposition of Elena M. David ("David Dep.") at 34:21-22); *see also*

Barrett Decl., Ex. 3 (quarterly Plan account statements from March 31, 2000, to September 30, 2004 for Elena David).[7])

12. David's quarterly account statements show that, as of December 31, 2000, her Plan account was allocated among the Nations Large Cap Stock Index Fund, the Stable Capital Fund, and Bank of America common stock. (Barrett Decl., Ex. 4 at DAVID-00383.) David invested solely in those three options until taking a distribution of her account in 2005. (*See* Barrett Decl., Ex. 3 (quarterly Plan account statements from March 31, 2000, to December 31, 2004, for Elena David); Ex. 10 (David Dep. at 24:3-6; 43:22-44:13) (David did not change her investment elections between the time she left the Bank in May 2004 and the time she took a full distribution from the Plan in mid-2005).)

13. David testified that she recalled that the fees associated with the mutual funds in the Plan had increased following the Bank of America merger with Nations Bank in 2000, and that her decision to file this lawsuit related to those fees. (*Id*. at 62:8-63:2; 31:17-20.)

14. Plaintiff Arleen Stach became a participant in the Plan after her previous employer merged into Bank of America and her former employer's plan was merged into the Plan. (Barrett Decl., Ex. 11 (Deposition of Arleen J. Stach ("Stach Dep.") at 26:17-19; 33:3-6; 58:21-25; 59:8-15).)

15. Stach's quarterly Plan account statements show that, as of December 31, 2000, her Plan account, like David's, was allocated among the Nations Large Cap Stock Index Fund, the Stable Capital Fund, and Bank of America common stock. (Barrett Decl., Ex. 6 at

---

[7] The account statements for David and the other Plaintiffs have been designated as "Confidential" under the Stipulated Protective Order entered by the Court on August 17, 2009. [Dkt. # 136.] However, in lieu of seeking leave to file the statements under seal, Defendants have obtained Plaintiffs' consent to file redacted versions of the statements that omit personal identifying information including home addresses and social security numbers and individual financial information in the form of account numbers and account balances. Defendants submit that such redactions are consistent with the requirements of Federal Rule of Civil Procedure 5.2 and Western District of North Carolina Administrative Procedures Governing Filing and Service by Electronic Means, ¶ I.

STACH00292.) According to subsequent account statements, Stach kept her account in these same investment options through at least September, 2009. (*See* Barrett Decl., Ex. 7 (quarterly Plan account statements from March 31, 2000, to September 30, 2009 for Arleen Stach).)[8]

16. Plaintiff Victor Hernandez enrolled in the Plan in 2000. (Barrett Decl., Ex. 12 (Deposition of Victor Hernandez ("Hernandez Dep.") at 58:23-25).) As of March 31, 2003, Hernandez had his Plan account invested solely in Bank of America stock. (Declaration of Susan Kelly ("Kelly Decl."), Ex. 1 (quarterly Plan account statements from March 31, 2003, to December 31, 2005 for Victor Hernandez) at BOA-DAVID2-00138738-40.) Account statements show that his Plan account has also, at various times, been invested in the Stable Capital Fund, the Nations International Equity Fund, the Nations SmallCap Equity Index Fund, the Fidelity Diversified International Fund, and the Fidelity Real Estate Investment Fund. (*See* Kelly Decl., Ex. 1 (quarterly Plan account statements from March 31, 2003, to December 31, 2005 for Victor Hernandez); Barrett Decl., Ex. 5 (account statements for the quarter ending December 31, 2005, and for the two-year periods ending June 13, 2007, and February 25, 2009, respectively).)

## III. DISCLOSURE OF BANK-AFFILIATED FUNDS TO PLAN PARTICIPANTS

17. As required by ERISA § 104(b), 29 U.S.C. § 1024(b), participants in the Plan receive copies of the Plan's summary plan description ("SPD") at or around the time that they become eligible to participate in the Plan. (Terry Decl., ¶ 15.) The SPD has historically appeared as part of the Bank's Associate Handbook and in supplements to the Associate Handbook. (*See id.* ¶¶ 10-14, Ex. 5 (Retirement Plans & ERISA chapters of 2000 Associate Handbook), Ex. 6 (Retirement Plans & ERISA chapters of 2002 Associate Handbook), Ex. 7 (Retirement Plans & ERISA chapters of 2003 Addendum to 2002 Associate Handbook), Ex. 8

---

[8] In January 2009, the Stable Capital Fund was consolidated with another fund to create the Stable Value Fund. (Andreasen Decl., Ex. 1 (chart identifying fund lineup and changes).)

(Retirement Plans & ERISA chapters of 2005 Associate Handbook), Ex. 9 (2006 Associate Handbook Retirement Plans Supplement).)

18. In addition, versions of the SPD were periodically circulated to all eligible employees. For example, SPDs were generally circulated to employees in 2000, 2002, 2005 and 2006. (Terry Decl., ¶ 16.)

19. Since at least May 2000, the summary plan description has consistently set forth a description of each of the funds in the Plan's investment lineup. For example, the 2000 SPD, dated May 15, 2000, identifies each investment option by name, states if it is a mutual fund, and provides a brief description of the fund's investment goals. (Terry Decl., Ex. 5, at BOA-DAVID-UR-00736093-94; *see also id.*, Ex. 6 (Retirement Plans chapter of 2002 Associate Handbook) at BOA-DAVID 01868-70, Ex. 7 (Retirement Plans & ERISA chapters of 2003 Addendum to 2002 Associate Handbook) at BOA-DAVID 01910, Ex. 8 (Retirement Plans chapter of 2005 Associate Handbook) at BOA-DAVID-UR-00742070-72, Ex. 9 (2006 Associate Handbook Retirement Plans Supplement) at BOA-DAVID 00951-64.)

20. In addition, the 2000 SPD advises Bank associates that they could obtain "a prospectus that contains more complete information, including charges and expenses, for any of the 10 Nations Funds by contacting the Personnel Center. Please read the prospectus carefully before investing." (Terry Decl., Ex. 5 at BOA-DAVID-UR-00736094; *see also id.*, Ex. 6 at BOA-DAVID 01870, Ex. 7 at BOA-DAVID 01910, Ex. 8 at BOA-DAVID-UR-00742072, Ex. 9 at BOA-DAVID 00964.)

21. The 2000 SPD also states, in the same section as the fund descriptions, that: "Banc of America Advisors, Inc., an affiliate of Bank of America, N.A., performs investment advisory and other services for Nations Funds, and receives fees for such services." (Terry

Decl., Ex. 5 at BOA-DAVID-UR-00736094.)  Similar disclosures appear in subsequent versions of the SPD.  (*See, e.g., id.*, Ex. 6 at BOA-DAVID 01869, Ex. 7 at BOA-DAVID- 01909, Ex. 8 at BOA-DAVID-UR-00742071, Ex. 9 at BOA-DAVID-00964.)

       22.     Separately, the 2000 SPD includes the following description of "Fees" that may be associated with investment management and Plan administration:

> The investment options available to you incur investment management expenses and associated operating expenses at the fund level.  In addition, the plan pays administrative expenses, such as participant recordkeeping, and reimburses the company for certain direct costs of administration.  All expenses are charged to the investment options on a pro rata basis and are reflected in the net return that is shown on Your Retirement Plans Quarterly Statement.  However, the fund level investment return and expense ratio information in the Retirement Plan Investment Options description and Nations Funds prospectuses do not include the plan level administrative expenses charged to the investment options.  You may request a copy of the Plan Expense Summary that describes these expenses by contacting the Personnel Center.

(*See* Terry Decl., Ex. 5, at BOA-DAVID-UR-00736094-95; *see also* Ex. 6 at BOA-DAVID 01870 (similar language in 2002 SPD), Ex. 7 at BOA-DAVID-01910 (similar language in 2003 Addendum to 2002 SPD), Ex. 8 at BOA-DAVID-UR-00742072 (similar language in 2005 SPD), Ex. 9 at BOA-DAVID-UR-00964 (similar language in 2006 SPD).)

       23.     Plaintiff David reviewed the SPD, including the description of investment options, when she established the initial investment directions for her Plan account, and recalled receiving periodic updates to the SPD.  (Barrett Decl., Ex. 10 (David Dep. at 37:6-9; 38:12-15; 39:17-24).)

       24.     Plaintiff Stach testified that she received the Bank's Associate Handbook through the office mail "every couple of years."  (Barrett Decl., Ex. 11 (Stach Dep. at 84:9-85:2; 85:23-86:8).)

25. The Plan's administrator also supplied Plaintiffs and other participants information regarding the investment options through other materials. For example, Plaintiffs David and Stach produced account statements for their Plan accounts from 2000 and 2001. As those documents reflect, the Plan administrator not only repeatedly disclosed the receipt of fees for services rendered to the Bank-affiliated funds but also compared the performance of these fund options, net of fees, to identified benchmarks. (Barrett Decl., Ex. 4 at DAVID00388 (David Quarterly Plan Statement December 31, 2000); Ex. 7 at STACH00265 (Stach Quarterly Plan Statement December 31, 2001).)

26. Likewise, both David and Stach produced copies of booklets from the 2000 and 2002 timeframe, entitled, "Retirement Plans Investment Options." Those booklets again reported the performance of the Plan's investment options and repeatedly disclosed the fee relationship between Bank of America and the Bank-affiliated funds. (Barrett Decl., Ex. 8 (Retirement Plans Investment Options booklet reporting fund performance as of March 31, 2000 (DAVID00359)); Ex. 9 (Retirement Plans Investment Options booklet reporting fund performance as of September 30, 2001 (STACH00549)).)

27. Although Hernandez could not specifically recall during his deposition the communications he received in connection with his Plan account, he admitted that documents describing his benefits under the Plan were available to him and specifically acknowledged receiving quarterly account statements. (Barrett Decl., Ex. 12 (Hernandez Dep. at 80:10-81:9; 99:2-5; 101:4-10; 102:19-103:5; 105:24-106:8).)

**ARGUMENT**

I. **STANDARD OF REVIEW.**

Summary judgment should be granted where there is no genuine issue as to any material fact, and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Any dispute of fact must be truly material, as "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The moving party is not required to negate all the elements of the opposing party's claim or defense, but merely needs to show "[the] absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party opposing summary judgment cannot rely on "metaphysical doubt as to the material facts," conclusory allegations, unsubstantiated assumptions or a scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). Rather, the non-moving party must present "sufficient evidence favoring . . . [judgment in favor of] that party." *Anderson*, 477 U.S. at 249.

## II. ERISA'S STATUTE OF LIMITATIONS.

ERISA § 413, 29 U.S.C. § 1113, provides that plaintiffs suing for a breach or violation of a fiduciary's responsibilities under ERISA generally must do so by the earlier of two deadlines. First, ERISA § 413(1) provides a statute of repose that serves as "an absolute barrier" to actions brought more than six years after the alleged breach or violation. *Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998); *accord Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 202-05 (3d Cir. 2006).[9]

Second, ERISA § 413(2) provides that the action must be brought within three years after the plaintiff acquires "actual knowledge" of the breach or violation. As the majority of circuits

---

[9] ERISA § 413 carves out one exception where the breach or violation is obscured through fraud or concealment, in which case the action must be brought within "six years after the date of discovery of such breach or violation." Plaintiffs, however, have not alleged any fraud or concealment of a breach or violation in this case, much less with the specificity required to plead fraud under Fed. R. Civ. P. 9(b). Nor is there any factual basis for such a theory. *See Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995) (explaining the statute of limitations may be tolled only if the plaintiff "establishes 'affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief.'") (citation omitted).

that have addressed the issue have recognized, the limitations period begins under this standard once the plaintiff has knowledge of the relevant or essential facts constituting the alleged violation, regardless of when plaintiff realized those facts gave rise to a potential breach. *See, e.g., Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003); *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992); *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985); *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir. 1987). Other district courts in the Fourth Circuit have held likewise. *See, e.g., Hunter v. Custom Bus. Graphics,* 635 F. Supp. 2d 420, 428 (E.D. Va. 2009) ("[I]t is not necessary for a potential plaintiff to have actual knowledge of every last detail of a transaction, or knowledge of its illegality.") (quotation omitted); *Trace v. Ret. Plan for Salaried Employees*, 419 F. Supp. 2d 846, 848 (E.D. Va. 2006) ("actual knowledge" is triggered by "knowledge of the facts or transaction that constituted the alleged violation").[10]

Plaintiffs' claims are barred under both provisions.

## III.  PLAINTIFFS' INVESTMENT-RELATED CLAIMS ARE TIME BARRED.

### A.  The Selection of the Challenged Investment Options Occurred More Than Six Years Before Plaintiffs Filed Suit.

Plaintiffs' core contention in this case is that the Defendants improperly caused the Plan to invest in Bank of America-affiliated mutual funds. (*See, e.g.*, Second Amended Class Action Complaint ("SAC") ¶¶ 1, 10-11, 41-43, 77.) Plaintiffs assert that, by choosing such funds as Plan investment options, Defendants both caused the Plan to engage in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106 (Count I) and breached their general fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 (Count II).

With one exception, however, all of the Bank-affiliated mutual funds in the Plan's lineup

---

[10]   The Fourth Circuit Court of Appeals has not had occasion to determine the precise meaning of "actual knowledge" under ERISA § 413(2). *See Browning v. Tiger's Eye Consulting, Inc.*, 313 F. App'x. 656, 661 (4th Cir.

were added to the lineup more than six years before Plaintiffs filed their initial complaint on August 7, 2006. (Statement of Undisputed Material Facts ("SUMF") ¶ 6.) Thus, any claim based on the selection of those investments is time barred under ERISA § 413(1). *See, e.g.*, *Tibble v. Edison Int'l,* 639 F. Supp. 2d 1074, 1119-20 (C.D. Cal. 2009) (holding that claims challenging inclusion of retail mutual funds in ERISA plan lineup expired six years after "the initial decision to add retail mutual funds . . . as an option in the Plan"); *Leber v. Citigroup, Inc.*, No. 07-Civ. 9329(SHS), 2010 WL 935442 at *7 (S.D.N.Y. Mar. 16, 2010) ("ERISA's six-year statutory period starts to run from 'the last action which constituted a part of the breach or violation' . . . [.] In this case, the relevant 'last actions' were the committee defendants' selections of affiliated funds as investment options for the Plan and their selection of the affiliated service provider, CitiStreet, in lieu of an outside entity.") (citation omitted).

And, though one Bank-affiliated mutual fund—the Columbia Quality Plus Bond Fund—was added within six years of Plaintiffs' suit, the addition of that single fund does nothing to sustain Plaintiffs' otherwise untimely claim. As of the time they filed suit, none of the Plaintiffs had ever invested their Plan accounts in that fund. As a result, Plaintiffs cannot demonstrate that they were at all harmed by the inclusion of that fund in the Plan's lineup—as they must do to have Article III standing. *See, e.g.*, *David v. Alphin*, No. 3:07-CV11, 2008 WL 5244483, at *5-8 (W.D.N.C. July 23, 2008) (holding that participants suing under ERISA have burden of showing that they have personally suffered some actual or threatened injury as a result of the putatively illegal conduct of defendant).

Accordingly, Plaintiffs' investment-related claims are barred under ERISA's six-year statute of repose. These claims should be dismissed, and judgment entered in favor of

---

2009).

Defendants.

### B. Plaintiffs Knew That the Plan Was Invested in Bank of America-Affiliated Mutual Funds More Than Three Years Before They Filed Suit.

Even if Plaintiffs could survive ERISA § 413(1)'s six-year limitations period, their investment-related claims would be still barred under ERISA § 413(2) because Plaintiffs had actual knowledge more than three years before filing suit that Bank of America-affiliated mutual funds were part of the Plan's investment lineup. By the end of 2000, each of the three named Plaintiffs had enrolled in the Plan. (SUMF ¶¶ 11, 14-15, 16.) And, as Plan participants, Plaintiffs received summary plan descriptions, contained in Associate Handbooks, both before they enrolled in the Plan and periodically thereafter. (SUMF ¶¶ 17-18.)

Since at least 2000, those summary plan descriptions have not only identified the Bank-affiliated mutual funds available to Plan participants but have consistently disclosed the relationship between those investment options and the Bank. (SUMF ¶¶ 19-20.) The summary plan descriptions further explained that the Plan investment options incur investment management fees and associated operating expenses and that Bank-affiliated funds paid fees to Bank affiliates for fund services. (SUMF ¶ 21.) Finally, they instructed participants to review "fund-level investment return and expense ratio information" and directed participants on how to obtain detailed fee and expense information. (SUMF ¶¶ 20, 22.)

Nor were the SPDs the only mechanism used to communicate the investment options—and the Bank's relationship to those options—to Plan participants. Rather, as materials from Plaintiffs' own files reflect, participants during the 2000 through 2002 time frame regularly received disclosures of such information through their quarterly account statements and through booklets reporting on fund performance. (SUMF ¶¶ 25-27.)

Several courts have held that the distribution of summary plan descriptions and other plan

materials is sufficient to establish the participants' "actual knowledge" of the documents' contents for the purposes of § 413(2). *See, e.g.*, *Shirk v. Fifth Third Bancorp*, Civ. No. 05-049, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009) ("In making this 'actual knowledge' determination, courts have 'focused on whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents.'") (quoting *Young v. GM Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 418-19 (S.D.N.Y. 2008)*, aff'd.* 325 F. App'x 31 (2d Cir. 2009).)  As those courts have recognized, "any interpretation of the term 'actual knowledge' that would allow a participant to refuse to accept and acknowledge information clearly set before him is untenable.  A plaintiff can always disavow actual knowledge, and the inner workings of the plaintiff's mind are impossible for a defendant to prove." *Reeves v. Airlite Plastics, Co.,* Civ. No. 05-56, 2005 WL 2347242, at *2, *6 (D. Neb. Sept. 26, 2005).

The content of the SPDs and other participant communications, in turn, was sufficient to inform plaintiffs of the factual basis for their investment-related claims.  Count I asserts violations of ERISA § 406, which provides that certain transactions between plans and fiduciaries or statutorily-defined "parties in interest" are *per se* prohibited.  Accordingly, courts have held that, in the context of such claims, knowledge of the transaction constitutes knowledge of the violation. *See, e.g.*, *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999) ("[I]f the fiduciary made an *illegal* investment—in ERISA terminology, engaged in a prohibited transaction—knowledge of the transaction would be actual knowledge of the breach."); *Figas v. Wells Fargo & Co.*, Civ. No. 08-4546, slip op. at 5 (D. Minn. Apr. 6, 2010) (quoting same).  This is confirmed by Plaintiffs' own complaint, which bases Count I on the simple facts that Defendants selected Bank-affiliated funds and that those funds generated fees for the Bank or its

subsidiaries. (SAC ¶¶ 77-79.) Plan communications unambiguously disclosed both of those facts in the 2000 to 2002 time period. As such, Plaintiffs cannot dispute actual knowledge of their investment-related prohibited transaction claim more than three years before the filing of the present lawsuit in 2006.

Indeed, the district court in *Figas* recently reached essentially the same conclusion on a virtually identical claim. In *Figas*, as here, plaintiff alleged that the fiduciaries of a bank violated ERISA § 406 by causing the bank's 401(k) plan to invest in mutual funds managed by a bank affiliate. Defendants moved for summary judgment on grounds that the claim was time barred under ERISA's three-year limitations period, and plaintiff responded by arguing that she had not had actual knowledge of all the elements of her claim. Slip. op. at 4-5. The court rejected this argument, holding that for the purposes of a prohibited transaction claim, it was enough that plaintiff knew that the plan was invested in bank-controlled funds and that fees were paid by the funds to the bank's affiliate. *Id.* There is no reason for this Court to hold otherwise here.

As with Count I, the Plan communications were likewise sufficient to put Plaintiffs on notice of their general fiduciary duty claim in Count II. Indeed, Plaintiffs have themselves asserted that their core contention in Count II—that Defendants imprudently and disloyally failed to consider and select less expensive, unaffiliated investment alternatives—is plainly evidenced by the Plan's lineup and its heavy concentration on Bank-affiliated funds:

> The fact that the Plans' investment in fee-generating managed funds were concentrated in funds managed by BoA Subsidiaries and Affiliates reflects a failure to consider and obtain less expensive, alternative, unaffiliated funds and services at the expense and to the detriment of the Plans and to the benefit of BoA Subsidiaries and Affiliates. Thus, Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1)(A),(B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

(SAC ¶ 82.)

- 16 -
Case 3:07-cv-00011-RJC-DLH   Document 167   Filed 05/11/10   Page 16 of 19

This assertion is fatal to Plaintiffs' Count II claim. Since at least 2000, the SPDs sent to Plaintiffs and other participants have consistently disclosed the Plan's lineup and its concentration in Bank-affiliated funds, as have other Plan communications. Thus, Plaintiffs had actual knowledge of their fiduciary duty claim when they received those disclosures—far more than three years before Plaintiffs finally filed suit in 2006.

Accordingly, in addition to being barred by the six-year limitations period under ERISA § 413(1), Plaintiffs' investment-related claims are also barred in their entirety by the three-year limitations period set forth in § 413(2), and judgment on those claims should therefore be entered in Defendants' favor.

## IV. PLAINTIFFS' SERVICE PROVIDER CLAIMS ARE TIME BARRED.

Just as Plaintiffs' investment-related claims are untimely under ERISA § 413, so are Plaintiffs' ancillary claims, which challenge the selection of the Bank or its affiliates as Plan service providers. In asserting those claims, Plaintiffs do not contend that the use of Bank-affiliated service providers, or the payments made to the Bank for such services, became imprudent or improper over time. Rather, Plaintiffs unambiguously assert that the selection of Bank-affiliated service providers and the decision to pay those service providers were unlawful from the outset:

> The Defendants also had the sole discretion to select service providers to the Plans. The Defendants used that discretion to select internal BoA units, subsidiaries and affiliates and caused the Plans to pay hundreds of thousands of dollars in annual fees to BoA Subsidiaries and Affiliates for services to the Plans, which were prohibited transactions under ERISA and breaches of Defendants' duties of prudence and loyalty.

(SAC ¶ 53.)

But the undisputed evidence is that the decisions both to engage Bank-affiliated service providers and to reimburse the Bank for expenses incurred in providing those services were

- 17 -
Case 3:07-cv-00011-RJC-DLH   Document 167   Filed 05/11/10   Page 17 of 19

made far more than six years before the initial filing of this action in August 2006. The Bank has in fact been providing administrative services to the Plan, and has been seeking expense reimbursement from the Plan, since at least the 1990s, when the Plan was still known as the NationsBank 401(k) Plan. This is confirmed by the Plan's annual filings with the Department of Labor, which identified both the services provided by the Bank and the amount paid by the Plan in connection with those services in a given year. (SUMF ¶ 8-9.)[11] And it is further reflected in the summary plan description dated May 15, 2000, which expressly stated that the Plan "reimburses the company for certain direct costs of administration." (SUMF ¶ 22.) Thus, because the decision Plaintiffs challenge predates their initial complaint by more than six years, Plaintiffs' ancillary claims are untimely under ERISA § 413(1).

In addition, because the 2000 SPD and subsequent SPDs disclosed the Plan's payment to the Bank for Plan administration expenses (SUMF ¶ 22), Plaintiffs have had actual knowledge of their claims since those documents were first distributed to Plaintiffs and other participants, *i.e.*, more than three years before this action was filed. Accordingly, Plaintiffs' service provider claims are also untimely under ERISA § 413(2)'s three-year limitations period.

## CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court enter summary judgment in their favor on grounds that Plaintiffs' claims are time barred by ERISA's statute of limitations.

---

[11] In the event that Plaintiffs' ancillary claims survive this Motion, Defendants intend to show that the Bank never charged the Plan an actual "fee" or earned a profit for Plan administrative services. Instead, consistent with Department of Labor regulations and with guidelines developed in 1999 with the assistance of outside counsel, the Bank only sought reimbursement from the Plan of out-of-pocket expenses incurred by the Bank as the direct result of providing Plan services.

Dated:  May 11, 2010                                         Respectfully submitted,

   s/ Shannon M. Barrett
ROBERT N. ECCLES (*Pro Hac Vice*)
beccles@omm.com
GARY S. TELL (*Pro Hac Vice*)
gtell@omm.com
SHANNON M. BARRETT (*Pro Hac Vice*)
sbarrett@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone:  (202) 383-5300
Facsimile:   (202) 383-5414

IRVING M. BRENNER
**MCGUIREWOODS LLP**
201 North Tryon Street
Charlotte, North Carolina 28202
Telephone:  (704) 343-2075
Facsimile:   (704) 373-8935

*Attorneys for Defendants Bank of America Corporation, J. Steele Alphin, Amy Woods Brinkley, Edward Brown III, Charles J. Cooley, Richard M. DeMartini, Barbara J. Desoer, James H. Hance, Jr., Kenneth D. Lewis, Liam E. McGee, Eugene McQuade, Alvaro de Molina, Michael E. O'Neill, Owen G. Shell, Jr., R. Eugene Taylor, F. William Vandiver, Jr., and Bradford H. Warner.*