# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:07cv11

| | | |
|---|---|---|
| ELENA M. DAVID; ARLEEN J. STACH; and VICTOR M. HERNANDEZ, | ) ) ) | |
| Plaintiffs | ) ) | |
| Vs. | ) ) | MEMORANDUM OF DECISION |
| J. STEELE ALPHIN; AMY WOODS BRINKLEY; EDWARD J. BROWN, III; CHARLES J. COOLEY; RICHARD M. DeMARTINI; BARBARA J. DESOER; JAMES H. HANCE; LIAM E. McGEE; EUGENE M. McQUADE; ALVARO G. de MOLINA; MICHAEL E. O'NEILL; OWEN G. SHELL, JR.; R. EUGENE TAYLOR; F. WILLIAM VANDIVER, JR.; BRADFORD H. WARNER; CHARLES W. COKER; STEVEN JONES; KENNETH D. LEWIS; BANK OF AMERICA CORPORATION; BANK OF AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on defendants' Motion for Summary Judgment on Statute of Limitations Grounds (#222), which has been fully briefed. A non-evidentiary hearing was conducted on July 20, 2011, at which counsel for all parties appeared and presented oral arguments. Having carefully considered the defendants' motion, considered the briefs of respective counsel, and heard arguments, the court enters the following findings,

-1-

conclusions, and Order granting summary judgment and dismissing this action.

## FINDINGS AND CONCLUSIONS

### I.    Procedural History

In the four years this action has been pending, the court has allowed plaintiffs three opportunities to amend their Complaint to address issues raised by defendants.   Presently before the court is plaintiffs' Third Amended Complaint (#219).

While the court will not recite the entire procedural history of the case, the court will highlight the history relating to the present Motion for Summary Judgment.  After plaintiffs filed their Second Amended Complaint (#83), defendants filed their first Motion for Summary Judgment on Statute of Limitations Grounds (#166).  Soon after briefing of such issue was complete, plaintiffs moved under Rule 15, Federal Rules of Civil Procedure, for leave to file their Third Amended Complaint (#207), arguing that such amendment would allege "facts and legal theories sufficient to overcome Defendants' statute of limitation argument."   Brief in Support of Plaintiffs' Motion for Leave to Amend Complaint (#208), at p. 11.   The court allowed the motion to file the Third Amended Complaint and denied the first Motion for Summary Judgment on Statute of Limitations Grounds as moot.  See Order (#218) (Conrad, C.J.)

After the Third Amended Complaint was filed, defendants answered (see Answer #221 & Answer #248) and filed their second Motion for Summary Judgment on Statute of Limitations Grounds (#222) on December 29, 2010.  In response to this motion, plaintiffs

-2-

filed their "Motion for Relief Under Fed.R.Civ.P. 56(f)" (#241) on January 18, 2011,[1] arguing therein that responsive facts were not then available to plaintiffs and that discovery was necessary on the statute of limitations issue. Over an objection from defendants which highlighted plaintiffs' earlier discovery opportunities, on March 8, 2011, this court reopened and allowed plaintiffs an opportunity to take depositions and conduct other discovery to justify their opposition to the second Motion for Summary Judgment. See Order (#249) (Howell, J.). In accordance with the schedule set forth by the court, the parties completed the additional discovery and fully briefed the issues now pending before the court.

## II.    Factual Background

### A.    Introduction

Plaintiffs are participants in the Bank of America 401(k) Plan (the "401(k) Plan"). While they have sued in their individual and representative capacities on behalf of plan participants, no motion to certify a class has been filed.[2] The defendants are Bank of America Corporation, a bank holding company (the "Bank"), the Bank of America Corporation

---

[1]    As Rule 56 was amended effective December 1, 2010, the reference should have been to Rule 56(d). See Fed.R.Civ.P. 56(d) (amended April 28, 2010, effective December 1, 2010).-

[2]    Plaintiffs' argument that they have standing to assert claims on behalf of Plan participants is without basis as they have neither sought certification nor demonstrated that they meet requirements for a class. Individual plaintiffs cannot overcome infirmities in their own case by claiming to represent a class of others. See Goodman v. Lukens Steel Co., 777 F.2d 113, 124 (3d Cir. 1985) (named plaintiffs were not adequate class representatives where their individual claims were barred by the statute of limitations); Wenning v. Jim Walter Homes, Inc., 606 F.2d 784, 785 (7th Cir. 1979)("The determination that plaintiff's claim was barred meant that plaintiff could not adequately represent the class . . . ." (citing Koos v. First National Bank, 496 F.2d 1162, 1164-65 (7th Cir. 1974)).

-3-

Corporate Benefits Committee ("CBC"), and the individual members of the CBC ("Individual Defendants").

B.    **Nature and Composition of the 401(k) Plan**

For the limited purposes of the pending motion, it appears undisputed that the 401(k) Plan provides plan participants the option to invest in both bank-affiliated and non-affiliated mutual funds. Plaintiffs claim that the defendants breached their fiduciary duties to the 401(k) Plan under ERISA by selecting bank-affiliated mutual funds as investment options. As made clear by plaintiffs in seeking leave to file their Third Amended Complaint (hereinafter "TAC"):

> Plaintiffs' claims are not based upon the properties of specific funds. Instead, Plaintiffs are making a general claim that BofA breached its fiduciary duties by improperly favoring its own proprietary funds for the Plan.

Brief in Support of Plaintiffs' Motion for Leave to Amend Complaint (#208), at p. 12.

It appears undisputed that the 401(k) Plan is a "defined contribution plan" within the meaning of ERISA, TAC., at ¶ 22, that the CBC is plan administrator of the 401(k) Plan, id., at ¶ 25, and that the 401(k) Plan was created effective July 1, 2000, through the merger of the BankAmerica 401(k) Plan and the NationsBank 401(k) Plan. Id., at ¶ 23. The 401Plan is a profit-sharing savings plan under which participating bank employees contribute a portion of their pre-tax earnings to the Plan. Those employee contributions are then matched in part by the bank or its affiliates. "The Bank of America 401(k) Plan, as amended effective July 1, 2000," Exhibit 1 to the Declaration of Stephen D. Terry (hereinafter "Terry Decl.") Plan participants, such as plaintiffs, direct the investment of their respective accounts among

-4-

a menu of investment options identified in the formal Plan document. Terry Decl., Ex. 4, 2006 Plan Document at BOA-DAVID 00070-71. The CBC has authority to alter the number of investments options and to add or terminate specific funds in the 401(k) Plan. Terry Decl., Ex. 4, 2006 Plan Document at BOA-DAVID 00059.

In the late 1990s, the 401(k) Plan's investment lineup was modified to add several "Nations Funds," which were funds managed by NationsBank Corporation, which was Bank of America's predecessor and Plan sponsor prior to their merger. Declaration of David Andreasen (hereinafter "Andreasen Decl."), Ex. 1.

In 1999, a project team was formed by the CBC to evaluate various issues relating to the 401(k) Plan, including the Plan's selection and use of proprietary investment options, processes for paying Plan expenses, and Plan investment performance and fees. Terry Decl., Ex. 10-11. Findings were presented to the CBC at its December 6, 1999 meeting, including findings that the Plan's procedures for selecting and monitoring investment options complied with fiduciary standards, that the performance and expenses of the mutual funds in the 401(k) Plan's lineup were reasonable, and that the administrative expenses paid by the Plan complied with all regulatory requirements. Id., Ex. 11. After considering the project team's report, the CBC agreed that the investment management and performance results of the Plan mutual funds were competitive. Id., Ex. 10.[3]

_____

[3] The court has, as a matter of necessity, discussed some undisputed facts that have been drawn from sealed portions of the pleadings. The court has attempted to minimize the portions that may be sensitive, but finds that such restatement is necessary to provide a complete picture of what transpired in the selection of bank affiliated funds.

-5-

It is equally undisputed that as of July 1, 2000,[4] the Plan's investment lineup consisted of the Bank of America Company Stock Fund, the Stable Capital Fund, and ten (10) Nations Funds.[5]  Since 2000, the 401(k) Plan has added only one bank-affiliated mutual fund, the *Columbia Quality Plus Bond Fund*, Andreasen Decl., Ex. 1 (chart identifying fund lineup and changes), which was added in December 2004 as a replacement for the Nations Bond Fund.  Id.  As of December 31, 2009, 19 of the 26 funds in the 401(k) Plan were non-bank-affiliated funds.  Id.

## C.    Participation in the Plan By Plaintiffs

Plaintiff Elena M. David participated in the Plan since at least the mid-1990s.  Barrett Decl., Ex. 10, Deposition of Elena M. David (hereinafter "David Dep.") at 34.  Her quarterly account statements show that, as of December 31, 2000, her Plan account was allocated among the Nations Large Cap Stock Index Fund, the Stable Capital Fund, and Bank of

_____

[4]       In their Brief in  Opposition, plaintiffs argue for the first time that their challenge to the selection of the initial bank-affiliated, a/k/a "Selection Class Funds," is timely even in the absence of fraud and concealment because "the Selection Class Funds were available as investment options to many Plan participants only on August 7, 2000."  Brief in Opposition, at pp. 42-43.)  Plaintiffs' argument contradicts a prior representation to the court that "that absent fraud or concealment those claims are untimely . . . ."  Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment on Statute of Limitations Grounds (# 199), at p. 2, n.2.  In addition, plaintiffs pled in their TAC that those selections occurred more than six years before the filing of this action in August 2006. TAC ¶ 128.  Finally, the court cannot find this to be a real and material issue of fact as some plaintiffs actually invested in such funds before August 2000.  Barrett Decl., Ex. 3A, at DAVID00301-02; Ex. 7A, at STACH00268-69.

[5]       These funds included  Nations LifeGoal Income and Growth Portfolio; Nations LifeGoal Balanced Growth Portfolio; Nations LifeGoal Growth Portfolio; Nations Investment Grade Bond Fund; Nations Value Fund; Nations International Equity Fund; Nations Marsico Focused Equities Fund; Nations LargeCap Index Fund; Nations MidCap Index Fund; and Nations SmallCap Index Fund. Terry Decl., Ex. 1, 2000 Plan Document at BOA-DAVID 00427. It is undisputed that the names of these funds changed as the banks merged.

America Common Stock. Barrett Decl., Ex. 4 at DAVID-00383. David invested solely in those three options until taking a distribution of her account in 2005. Barrett Decl., Ex. 3 quarterly Plan account statements; Ex. 10, David Dep. at pp. 24, 43-44. She testified that she recalled that the fees associated with the mutual funds in the Plan had increased following the Bank of America merger with Nations Bank in 2000, and that her decision to file this lawsuit related to those fees. Barrett Decl., Ex. 10 at pp. 31, 62-63.

Plaintiff Arleen Stach became a Plan participant after her previous employer merged into Bank of America and her former employer's plan was merged into the Plan. Barrett Decl., Ex. 11, Deposition of Arleen J. Stach (hereinafter "Stach Dep.") at pp. 26, 33, 58, & 59. Her quarterly Plan account statements show that, as of December 31, 2000, her Plan account was allocated among the Nations Large Cap Stock Index Fund, the Stable Capital Fund, and Bank of America stock. Barrett Decl., Ex. 6 at STACH00292. According to subsequent account statements, Stach kept her account in these same investment options through at least September, 2009. Barrett Decl., Ex. 7, quarterly Plan account statements.

Plaintiff Victor Hernandez enrolled in the Plan in 2000. Barrett Decl. Ex. 12, Deposition of Victor Hernandez (hereinafter "Hernandez Dep."), at p. 58. As of March 31, 2003, Hernandez had his Plan account invested solely in Bank of America stock. Declaration of Susan Kelly (hereinafter "Kelly Decl."), Ex. 1, quarterly Plan account statements, at BOA-DAVID2-00138738-40. Account statements show that his Plan account has also been invested in the Stable Capital Fund, the Nations International Equity Fund, the Nations SmallCap Equity Index Fund, the Fidelity Diversified International Fund, and the Fidelity

Real Estate Investment Fund.  Id., and Barrett Decl., Ex. 5, quarterly Plan account statements.

###### D.      Disclosures Concerning the Bank Affiliated Funds

It is undisputed that since at least 2000, the 401(k) Plan has provided plaintiffs and all Plan participants with disclosures about the Plan, including the funds included in the Plan and related fees. In accordance with 29 U.S.C. § 1024(b), participants in the Plan receive copies of the Summary Plan Description (hereinafter "SPD") when they become eligible to participate in the Plan. Terry Decl., ¶ 15. The SPD was periodically circulated to all eligible employees, including in 2000, 2002, 2005 and 2006.  Terry Decl., ¶ 16. Since at least May 2000, the summary plan description has consistently set forth a description of each of the funds.  Terry Decl., Ex. 5.

Of particular relevance to this action, the May 15, 2000, SPD informs participants that they could obtain a "prospectus that contains more complete information, including charges and expenses, for any of the 10 Nations Funds by contacting the Personnel Center." Terry Decl., Ex. 5 at BOA-DAVID-UR-00736094. The 2000 SPD, as well as later SPDs, also advised participants that "Banc of America Advisors, Inc., an affiliate of Bank of America, N.A., performs investment advisory and other services for Nations Funds, and receives fees for such services." Terry Decl., Ex. 5 at BOA-DAVID-UR-00736094.  As to fees, the 2000 SPD provided, as follows:

> The investment options available to you incur investment management expenses and associated operating expenses at the fund level. In addition, the plan pays administrative expenses, such as participant recordkeeping, and

-8-

reimburses the company for certain direct costs of administration. All expenses are charged to the investment options on a pro rata basis and are reflected in the net return that is shown on Your Retirement Plans Quarterly Statement. **However, the fund level investment return and expense ratio information in the Retirement Plan Investment Options description and Nations Funds prospectuses do not include the plan level administrative expenses charged to the investment options. You may request a copy of the Plan Expense Summary that describes these expenses by contacting the Personnel Center.**

Terry Decl., Ex. 5, at BOA-DAVID-UR-00736094-95 (emphasis added).

Plaintiff David testified that she reviewed the SPD, including the description of investment options, when she established the initial investment directions for her Plan account, and recalled receiving periodic updates to the SPD. Barrett Decl., Ex. 10, David Dep., at pp. 37-39. Plaintiff Stach testified that she received the Associate Handbook through the office mail "every couple of years." Barrett Decl., Ex. 11, Stach Dep. at 84-86.

Additional information was also provided to Plan participants in other ways. Plaintiffs David and Stach produced account statements for their Plan accounts from 2000 and 2001. Those Plan statements disclosed the receipt of fees for services rendered to the bank-affiliated funds and also compared the performance of such fund options, net of fees, to identified benchmarks. Barrett Decl., Ex. 4 at DAVID00388, David Quarterly Plan Statement Dec. 31, 2000; Ex. 7 at STACH00265, Stach Quarterly Plan Statement Dec. 31, 2001. In addition, Plaintiffs David and Stach were able to produce their copies of booklets from 2000 and 2002, entitled "Retirement Plans Investment Options." Those booklets reported the performance of the Plan's investment options and disclosed the fee relationship between Bank of America and the bank-affiliated funds. Barrett Decl., Ex. 8, Retirement

-9-

Plans Investment Options booklet reporting fund performance as of March 31, 2000, DAVID00359; Ex. 9, Retirement Plans Investment Options booklet reporting fund performance as of Sept. 30, 2001, STACH00549.

Plaintiff Hernandez could not specifically recall during his deposition the communications he received in connection with his Plan account, but testified that documents describing his benefits under the Plan were available to him and specifically acknowledged receiving quarterly account statements. Barrett Decl., Ex. 12, Hernandez Dep., at 80-81, 99, 101-103, 105-106.

### E. The Allegedly Fraudulent Materials

#### 1. Plaintiffs' Contentions

In the TAC, plaintiffs identify a number of letters and draft communications that they contend were misleading, as follows:

a. A document dated June 20, 2000 and entitled "Leader Talking Points" was distributed to Bank of America supervisors for use in disseminating information to Plan participants regarding the new plans effective July 1, 2000. Supervisors were directed to respond to participants inquiring about regulatory compliance with the following: "we have…reviewed the plans' provisions extensively with internal and external legal counsel and are confident the plans honor all relevant laws."

b. A document prepared for use in training individuals working in a call center whose sole purpose was to respond to participant inquiries regarding BoA employee benefit plans, contained the following Q&A: "Is it proper to be using funds affiliated with Bank of America for the Bank of America 401(k) Plan? Yes. Bank of America, through its Corporate Benefits Committee as the plan fiduciary, has carefully evaluated these mutual funds with respect to their cost, their performance and the full range of risk and reward they provide, and

-10-

have determined that they are proper choices for the Bank's 401(k) Plan."

c. A document dated May 15, 2000 prepared for communication with the media contained the following Q&A: "Is it proper to be using funds in the Bank of America 401(k) Plan that is managed by Bank of America? A Bank of America affiliate manages these funds and yes, this is proper. Bank of America, through its Corporate Benefits Committee as the plan fiduciary, has carefully evaluated these funds with respect to their cost, their performance and the full range of risk and reward they provide, and have determined that they are proper choices for the Bank's 401(k) Plan. The Bank of America and its family of companies is one of the largest money managers in the world with approximately $230 billion in assets under management for its clients."

d. In response to participant David Mackenzie's correspondence addressed to the Secretary of the Committee and others at BoA raising questions regarding the replacement of a collective investment fund with a Nations Mutual Fund, the Bank's in-house benefits counsel, Arthur H. Colas, Jr., sent two letters to Mr. Mackenzie that misled him into believing that nothing improper had occurred in the selection of the funds. Mr. Colas referred to ERISA provisions that did not present compliance problems, while failing to provide information and facts regarding the Committee Defendants' biased and otherwise woefully defective investment selection process. Mr. Colas indicated that "serious consideration" had been given to Mr. Mackenzie's concerns regarding the Plan investment options, and that they had been "discussed fully with Bob Shell, who …is a member of the Corporate Benefits Committee and head of the Bank's fiduciary group." Mr. Colas also indicated that the "Committee is, and has been for years, advised by competent outside legal counsel, and duties of Plan fiduciaries are discussed at its meetings. The Plan fiduciaries have considered the appropriate factors in making their decisions." Mr. Colas testified that he conducted no investigation into Mr. Mackenzie's concerns. There is no indication that Mr. Mackenzie's concerns were given any consideration whatsoever, let alone "serious consideration," and the representation that the fiduciaries considered the appropriate facts in making their decision was also false.

e. In response to a letter from participant Susan Kirk raising self-dealing issues similar to those raised by Mr. Mackenzie's letter, Mr. Colas

again provided references to ERISA provisions that did not pose compliance problems for the Plan, while failing to provide information regarding the Committee's selection process and applicable law.

f.    In a memo responding to seventeen employees of newly acquired Montgomery Securities who had raised questions regarding the propriety of the mutual funds available under the Plan, a Corporate Personnel department employee, Lestor Ranson, responded in language nearly identical to the language used by Mr. Colas in his responses to Mr. Mackenzie and Ms. Kirk, pointing to ERISA provisions that did not present compliance problems while omitting references to applicable case law and facts regarding the Committee Defendants' selection process clearly indicating violation of that law.

TAC, ¶ 80.[6] The court will discuss *infra* the discovery and undisputed facts surrounding these allegations.

## 2.    Letters from Plan Participants and the Bank's Response

It is undisputed that in early 2000, Bank of America received letters from two former bank employees, David McKenzie and Susan Kirk (who are mentioned in paragraph 80 of the TAC), challenging the decision of the Plan fiduciaries to discontinue the Plan's investments in certain collective investment trusts and transfer those assets to bank-affiliated mutual funds. Barrett Decl., Ex. 16, Letter from David G. MacKenzie to Bank of America, Trustee of the 401(k) Plan, dated April 14, 2000, MACKENZIE000003; Ex. 17, Letter from MacKenzie to Secretary, Employee Benefit Administrative Committee, dated April 24, 2000, MACKENZIE 000006; Ex. 18, Letter from Susan Kirk to Art Colas, dated July 10, 2000, MACKENZIE 000018. Importantly, all of those letters predate August 2000 and are

---

[6]    While these paragraphs were properly redacted from the public version of the Third Amended Complaint as allowed by the confidentiality provisions of the Protective Order, the court finds discussion of such allegations to be necessary to resolution of this action.

evidence that fellow plan participants had access to sufficient information to actually challenge the inclusion of bank affiliated funds in the Plan.

Mr. MacKenzie, citing his extensive experience "in the fiduciary field" states in his letters that the fees associated with the bank-affiliated mutual funds were unreasonable and accused the Plan's fiduciaries of engaging in "Self-Dealing," which Mr. MacKenzie described as "a major violation of a Trustee's fiduciary's duty to its beneficiaries." Barrett Decl., Exs. 16 and 17. Ms. Kirk, a retired lawyer, stated in her letter that the bank appeared to be profiting from the changes in the lineup "at the expense of those whose funds are involved." Barrett Decl., Ex. 18.

In-house counsel for the bank, Art Colas, responded to Mr. MacKenzie's and Ms. Kirk's letters, expressing his belief that the CBC's investment selection process was reasonable and in accordance with applicable standards of fiduciary conduct. Barrett Decl., Ex. 19, Letter from Arthur H. Colas, Jr. to David H. MacKenzie, dated May 4, 2000, MACKENZIE 000008-9; Ex. 20, Letter from Colas to Kirk, dated August 11, 2000, MACKENZIE 000020-21; Ex. 23, Deposition of Arthur H. Colas, Jr. (hereinafter "Colas Tr.") at p. 101.

After receiving an initial response from Mr. Colas, Mr. MacKenzie wrote to Dana Farber, a member of the Bank's Corporate Benefits Department, reasserting his view that the Plan's fiduciaries were engaging in "Self-Dealing," and stating, "[t]his is a flat violation of its Fiduciary duty!" Mr. MacKenzie further complained that "the market rate for running an index fund is substantially lower tha[n] the 35 basis points we are being charged." Barrett

-13-

Decl., Ex. 21, Letter from MacKenzie to Farber, dated May 18, 2000, MACKENZIE 000010-13. 37. Mr. Colas responded to Mr. MacKenzie's letter to Dana Farber, noting in part that "[t]he Committee is, and has been for years, advised by competent outside ERISA counsel, and duties of plan fiduciaries are discussed at its meetings." Barrett Decl., Ex. 22, Letter from Colas to MacKenzie, dated June 13, 2000, MACKENZIE 000015-17. Mr. Colas testified during discovery that it was his understanding that the law firm *Kennedy Covington* advised the CBC on its Plan-related fiduciary duties. Barrett Decl., Ex. 23, Colas Tr. at 99, 127-128; Ex. 2, Bank of America 401(k) Plan 2000 Form 5500, Schedule C, at BOA-DAVID2-00138927-94.

Mr. Colas also stated that Mr. MacKenzie's concerns and his response had been discussed with CBC member Owen "Bob" Shell, a defendant herein. Barrett Decl., Ex 22. Mr. Colas understood that someone at the bank had discussed the issues raised by Mr. MacKenzie with Defendant Shell, but does not recall contacting him personally. Instead, Mr. Colas believes he would have contacted Defendant Shell through an intermediary. Barrett Decl., Ex. 23, Colas Tr. at p. 57. It is undisputed that Defendant Shell provided no commentary on Mr. Colas's written response to Mr. MacKenzie's letter. Id., at pp. 102-103. Defendant Shell does not currently recall discussing Mr. MacKenzie's concerns with anyone. Barrett Decl., Ex. 28, Deposition of Owen G. Shell, Jr. at p. 182.

Although Ms. Kirk represented in her letter to Mr. Colas that Mr. MacKenzie had "been contacted by other Plan participants," no participants had in fact contacted Mr. MacKenzie regarding issues addressed in his and Ms. Kirk's letters. Barrett Decl., Ex. 15,

-14-

MacKenzie Tr. at 193-194. Mr. MacKenzie did not discuss his letters to the bank with any Plan participants other than Ms. Kirk. Id., at pp. 117-118, 187-188, 195- 196.

### 3. The Group Letter

On November 27, 2000, a group of employees in a department within the bank wrote to bank employee Lester Ranson, complaining about the Plan's investment lineup. Barrett Decl., Ex. 24, Letter from Michael Johnston, et al., to Ranson. Plaintiffs herein were not among the signatories to the letter. Id. According to Mr. Colas, it is unlikely that the CBC would have been informed of the employees' group letter. Barrett Decl., Ex. 23, Colas Dep. at p. 253. Although unsigned drafts of a memorandum responding to the employees' letter have been produced, the drafts do not indicate whether a copy was ever sent. Barrett Decl., Exs. 25-27, Drafts from Ranson to Johnston, DAVID-UR-00330831, BOA-DAVID 01498229-01498231, BOA-DAVID2-00376601- 00376603.


### 4. Documents Created by the Bank's Communications Department

During July 2000, the bank's communications department created a draft document entitled "Leader Talking Points Regarding The One-Time Transfer," which addressed potential questions relating to a one-time transfer of assets from the Plan to the bank's pension plan.[7] Barrett Decl., Ex. 29, Deposition of Katherine Dugan [30(b)(6)], (hereinafter "Dugan Tr.") at 132, Ex. 30, BOA-DAVID-UR-00733961. The document provides, in part:

---

[7] Plaintiffs' claims against and concerning the pension fund were dismissed early on in this litigation.

-15-

"We have, however, reviewed the plans' provisions extensively with internal and external legal counsel and are confident the plans honor all relevant laws." Id. There is no evidence that the "we" referred to in the document is any of the defendants, including the CBC.

The bank's communications department also created a document entitled "Key Messages: External Media," dated May 15, 2000. Barrett Decl., Ex. 29, Dugan Tr. at 65:10-12; Ex. 31, BOA-DAVID-UR-00733963-00733979. Nothing in the document indicates that it was prepared for, or shared with, any particular external media; rather, the document bears the legend "For Internal Use Only: Do Not Distribute." Id.

Also produced in discovery were a draft set of "Q&As," which address changes to the Bank of America retirement plans, including the 401(k) Plan. Barrett Decl., Ex. 29, Dugan Tr. at 53-54; Ex. 32, BOA-DAVID-00257099-00257100. The document does not indicate its intended audience or whether it was in fact used to communicate with Plan participants. Id.

## III. Applicable Standard

Defendants have moved for summary judgment based on the bar of the statute of limitations. Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The rule goes on to provide procedures for plaintiffs to use in

-16-

responding to a Motion for Summary Judgment:

> **(c) Procedures.**
>> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>>
>> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>>
>> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.
>>
>> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent

must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his

-18-

or her favor. <u>Anderson</u>, <u>supra</u>, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Id.</u>, at 252.

## IV.    Discussion

### A.    Statute of Limitations

The Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") does not include a general statute of limitations for bringing benefits claims and federal courts must look to and apply the most analogous state statute of limitations. <u>Board of Regents v. Tomanio</u>, 446 U.S. 478, 483-84 (1980); <u>Miles v. New York State Teamsters Conference</u>, 698 F.2d 593, 598 (2d Cir.), <u>cert. denied</u>, 464 U.S. 829 (1983). Unlike benefits claims, ERISA *does* contain a statute of limitations and a statute of repose for bringing claims of breach of fiduciary duty against plan fiduciaries:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>     (1)    six years after
>         (A)    the date of the last action which constituted a part of the breach or violation, or
>         (B)     in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>     (2)    three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. The statute of repose serves as "an absolute barrier" to actions brought

more than six years after the alleged affirmative breach or violation. Radford v. Gen. Dynamics Corp., 151 F.3d 396, 400 (5th Cir. 1998); accord Ranke v. Sanofi-Synthelabo Inc., 436 F.3d 197, 202-05 (3d Cir. 2006).

In order to determine when the statute accrues, the court will look to the substance of each claim of breach of fiduciary duty, grouping claims when appropriate. It is undisputed that plaintiff filed this action August 7, 2006, and that the bank-affiliated funds, except the *Columbia Quality Plus Bond Fund*, were all added to the Plan lineup more than six years before this action was filed.

## B. Counts I and III

In Counts I and III, plaintiffs assert violations of ERISA's prohibited transaction rules. Specifically, plaintiffs allege in Count I that the CBC defendants "caused" the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1106. TAC, ¶¶ 42-60. In Count III, plaintiffs allege that the bank participated in and abetted those prohibited transactions. TAC ¶¶ 121-25. Reading such allegations in a light most favorable to them, plaintiffs contend that when defendants selected bank affiliated funds for inclusion in the 401(k) plan, such inclusion violated ERISA.

In light of plaintiffs' Rule 56(d) response, and after independent review by this court, the undersigned determines that Judge Howell properly allowed plaintiffs to take extensive discovery on Section 1113 issues. Review of the undisputed facts produced as a result of such efforts reveals that all-but-one of the bank-affiliated funds were added more than six

-20-

years before plaintiffs filed this action.[8] Thus, ERISA's statute of repose, 29 U.S.C. §

1113(1)(a), forecloses the prohibited transaction claims asserted in Counts I and III.[9] Indeed,

plaintiffs previously argued that "absent fraud or concealment those claims are untimely . .

. ." Plaintiffs' Brief in Opposition to Defendants' First Motion for Summary Judgment on

Statute of Limitations Grounds (# 199), at p. 2, n.2. In addition, plaintiffs pled in the TAC

that those selections occurred more than six years before the filing of this action in August

2006. TAC ¶ 128.

    In apparent recognition that these claims are time barred, plaintiffs attempt to avoid

the absolute bar of Section 1113(1)(a) by arguing that their claims are really "failure to

remove" claims, i.e., that the statute of repose did not run because the plan fiduciaries had

a continuing obligation to remove these allegedly offending funds from the plan. See 29

U.S.C. § 1113(1)(b). Put another way, plaintiffs are contending that Counts I and III are

timely filed prohibited transaction claims because defendants failed to remove or replace

such funds with other funds that would be within the statute of repose. At the hearing,

defendants clarified their contention and argued that the statute of repose did not run, and still

---

[8]     As discussed *infra* in relation to Count V, plaintiffs lack Article III standing to challenge the bank affiliated fund added within the six years immediately preceding the filing of this action.

[9]     The court notes that there is no blanket prohibition on employers including proprietary funds in a 401(k) plan offered to employees. See Department of Labor ERISA Prohibited Transaction Exemption 77-3, 42 Fed. Reg. 18,734 (Apr. 8,1977) (expressly permitting investment by benefit plans in mutual funds advised or underwritten by the plan's sponsors or its affiliates).

has not run, because contributions are allocated to such offending funds every month and the fiduciaries are continually obliged to remove such funds at their regular board meetings.[10]

While ERISA fiduciaries are in fact obliged to monitor funds contained in the Plan lineup for material changes, the court can find no continuing obligation to remove, revisit, or reconsider funds based on allegedly improper initial selection. If that were the case, the limitations imposed by Section 1113(1)(a) would be meaningless and expose present Plan fiduciaries to liability for decisions made by their predecessors - - decisions which may have been made decades before and as to which institutional memory may no longer exist. Indeed, such a determination would turn Section 1113(a) on its head, making Section 1113(1)(b)'s open-ended period of repose for failure to correct *omissions* also applicable to failure to correct *affirmative acts*, which are clearly controlled by Section 1113(1)(a)'s close-ended period of repose.

Not only does such argument run counter to logic and Section 1113's temporal limitations, such argument has been rejected by other courts. While only persuasive in this court, in <u>Figas v. Wells Fargo & Co.</u>, Civ. No. 08-4546 (D. Minn. Apr. 6, 2010),[11] the district court in <u>Figas</u> expressly refused to accept an identical argument asserted by plaintiffs therein, holding as follows:

---

[10]     The court does not have before it a transcript, and such recital of arguments is based on the court's notes.

[11]     While an earlier decision in such case can be found in Westlaw, as of 7/25/2011 a copy of such decision was not available from such service. A hard copy is, however, found within the pleadings at Docket Entry # 150, "Figas Slip Op.", Barrett Decl., Ex. 13. Counsel for plaintiff in <u>Figas</u> is lead counsel for plaintiffs herein.

> Figas argues that the statute of limitations has not run because each new investment in a Wells Fargo fund constitutes a separate violation, and thus there are violations within the limitations period. She offers no binding authority for this proposition, however, and the Court has found none. . . . Here, the conduct of which Count I complains is Defendants' decision to invest in Wells Fargo funds.

Id., at 5. In another persuasive decision, which addressed identical claims also brought by plaintiffs' counsel herein, Leber v. Citigroup, Inc., 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010),[12] the district court concluded that the relevant conduct for plaintiffs' prohibited transaction and fiduciary duty claims was not the failure to remove funds, but the initial selection of the challenged funds:

> ERISA's six-year statutory period starts to run from the "last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). In this case, the relevant "last actions" were the committee defendants' selections of affiliated funds as investment options for the Plan and their selection of the affiliated service provider, CitiStreet, in lieu of an outside entity. The complaint, however, is silent as to when virtually all of those actions occurred. While the complaint provides general date ranges for several of the transactions in question ( e.g., Am. Compl. ¶¶ 43-46), it does not state with any specificity when the committee defendants selected for investment any of the funds specifically identified as having higher management fees than comparable unaffiliated funds or when the committee defendants selected CitiStreet to provide management and administrative services to the Plan.
> * * *
> Plaintiffs concede that any breaches that fully occurred more than six years before this action was commenced are barred by statute but argue instead that defendants' cumulative course of conduct amounted to a "continuing violation," and, accordingly, that no "final action" was taken more than six years before this suit was filed.
> The "continuing violation" doctrine, which stems from the ongoing nature of the duty imposed on ERISA fiduciaries, allows plaintiffs to bring suit

---

[12]    Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

for a course of conduct dating back beyond the statutory period provided the fiduciaries engaged in some sort of repeated and ongoing conduct that stretched into the six-year period. *See Buccino v. Cont'l Assurance Co.*, 578 F.Supp. 1518, 1521-22 (S.D.N.Y.1983) (collecting cases); *see also Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed.Cir.1997). By contrast, "the continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time." *Miele v. Pension Plan of N.Y. State Teamsters Confrence Pension & Ret. Fund*, 72 F.Supp.2d 88, 102 (E.D.N.Y.1999) (collecting cases).

Id., at *7.[13]

Plaintiffs argue that each time the board meets and each time funds are placed into an allegedly prohibited fund constitutes a separate or continuing violation. However, the conduct of which plaintiffs complain in Counts I and III is the *initial* decision to invest in bank-affiliated funds, actions for which must be brought within the period of repose as provided in Section 1113(1)(a) and cannot be recast as a failure to correct an omission under Section 1113(1)(b). Further, ERISA does not impose any obligation on fiduciaries to revisit their initial decision to include bank-affiliated funds in the Plan lineup; rather, it prohibits and makes actionable a plan fiduciary's decision to engage in a prohibited transaction. Tibble v. Edison Int'l, 639 F.Supp. 2d 1074, 1119-20 (C.D. Cal. 2009). In other words, ERISA does not make actionable a fiduciary's failure to undo what has been done, but front loads the process by prohibiting certain transactions. If fiduciaries engage in prohibited transactions, aggrieved participants have a period of time to challenge such selection as

---

[13] The court in *Leber* did not then dismiss the claims because "the Court is constrained to the pleadings which artfully make no mention of when most, if not all, of the relevant breaches occurred." *Id.*

-24-

provided in Section 1113.

Having considered the Motion for Summary Judgment on these claims, and finding that no genuine issues of material fact exist, the court will dismiss Counts I and III as time barred.

## B.    Counts II, IV, and V

In Counts II, IV, and V, plaintiffs  allege violations of ERISA's fiduciary duty of prudence and loyalty, which are also time barred.  As discussed above, plaintiffs have conceded that all but one of the bank-affiliated mutual funds in question were added to the Plan more than six years before the filing of their actiont.

### 1.    Count IV

In responding to the Motion for Summary Judgment, plaintiffs contend that the limitations period is tolled based on ERISA's "fraud and concealment exception," and have again argued that: (1) the claim is really one for failure to remove the funds from the Plan lineup rather than an unlawful initial selection claim; and (2) that they have standing to pursue a claim as to the *Columbia Quality Plus Bond Fund*, the only bank-affiliated fund added to the Plan's lineup within the six-year period immediately preceding the filing of the initial Complaint.

Under the "fraud or concealment" exception to the general limitation periods found in Section 1113, an action based on an alleged breach or violation that is obscured through a defendant's fraud or concealment must be brought within "six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113.  The burden is on plaintiffs to

-25-

come forward with some evidence that the named defendants obscured the cause of action through fraud or concealment. Browning v. Tiger's Eye Benefits Consulting, 313 F. App'x. 656, 663 (4th Cir. 2009). As the undisputed facts discussed above show, there simply is no evidence that any of the committee defendants engaged in any conduct that obscured or in any way hindered these plaintiffs from realizing facts upon which a cause of action could have conceivably been brought. While the court notes defendants' strong objections to the court's allowance and reopening of discovery, independent review by this court reveals that it was the allowance of additional discovery that has led to this court to the inescapable conclusion that not only were facts not obscured, other Plan participants actually perceived the claim, wrote grievance letters to the bank, and even threatened suit over the Plan's decision to include bank affiliated funds in 1999-2000.

Further, the fact that such complaints may have generated correspondence in defense of the initial selection, or that the bank may have generated "talking points" concerning the legality of including such bank-affiliated funds, cannot be considered "fraud" or an attempt to "conceal" an unlawful transaction. The only tie between any of the challenged communications and any named committee member is the fact that someone discussed with Defendant Shell the response to Mr. McKenzie's letter of grievance. TAC, ¶ 84. There is no evidence that Defendant Shell authored, contributed, or in any way discussed the responsive letter with its author. Because there is no evidence that the any committee defendants engaged in any purportedly fraudulent conduct, summary judgment must be granted as to Count IV.

-26-

Even assuming that all the challenged materials were attributable to the committee defendants, there is absolutely no evidence that such documents were generated with an intent to defraud or mislead Plan participants. In sum, each of the allegedly fraudulent documents provides that inclusion of bank-affiliated funds was both prudent and legal. These are statements one would expect to be found in any prospectus or disclosure; however, plaintiffs contend that they are untrue and that they form the basis of their fraud or concealment contention under the exception to Section 1113. While it is true that the Court of Appeals for the Fourth Circuit has not directly addressed the requirement of *intent* in such context*,* close consideration of the decisions of the Fourth Circuit indicates to this court that not only would plaintiffs be required to present evidence that the statements were untrue, but that defendants knew such were untrue and caused them to be made with an intent to deceive Plan participants. The Fourth Circuit has held that plaintiffs must show that defendants "engaged in a course of conduct *designed* to conceal evidence of their alleged wrongdoing." Browning, 313 F. App'x at 663 (citation omitted; emphasis added). The court finds the phrase "course of conduct designed" to be synonymous with a requirement of "intent." To read Browning or Section 1113(3) otherwise would make any conceivable decision of Plan fiduciaries "obscurable" by any due diligence statements contained in Plan brochures, even when those statements are made in good faith and with no intent to deceive. Such a reading would not only eviscerate Section 1113(1) & (2) and cause the Section 1113 exception to swallow the rule, it would discourage plan fiduciaries from including such important information in Plan documents.

-27-

Finally, even if plaintiffs had come forward with evidence that the challenged statements were both untrue and published with an intent to deceive or obscure, plaintiffs have not shown that the facts upon which their claims are based were in any way obscured by such documents, that they lulled them into inaction, or in any manner impacted plaintiffs' ability to recognize or pursue their claims. See Browning, supra. Indeed, the evidence produced indicates that plaintiffs received Plan SPDs, quarterly statements, and were advised that they could request more detailed disclosures concerning the bank-affiliated funds. There is absolutely no evidence that any of the plaintiffs were exposed, influenced, or even received any of the allegedly fraudulent documents. There simply is no evidence such documents had any impact on plaintiffs' ability to recognize and pursue their claims.

Finding that no genuine issue of fact remain, the court will grant defendants' Motion for Summary Judgment and dismiss Count IV as time barred.

## 2.    Count II

New to the TAC is Count II, in which plaintiffs allege that failure to remove bank-affiliated funds within the limitations period is actionable, which is a slightly different take on a continuing violation claim. Plaintiffs do not claim that the bank-affiliated funds became imprudent during the period through fund performance or increased fees; rather, they contend that the funds were improperly selected. Count II is, therefore, not a claim of improper monitoring of the fund, but a claim based on a non-existent duty to revisit initial selection of a fund to determine if it was a prohibited transaction. Tibble, 2010 WL at **31-33 (fiduciaries had no duty to engage in a "full due diligence review equivalent to that

-28-

performed for a newly-added fund" where funds did not materially change during limitations period). As there is no duty under ERISA to revisit initial selection decisions and there have been no allegations or evidence as to material changes occurring since such selection, this claim challenges the initial selection of bank affiliated funds and is, therefore, time barred.

### 3. Count V

In Count V, plaintiffs contend that defendants breached their fiduciary duties when they selected the *Columbia Quality Plus Bond*, which is also a bank affiliated fund. Unlike the other bank-affiliated funds at issue, this fund was selected by defendants within the six year period before this action was filed August 7, 2006. However, it is undisputed that none of the named plaintiffs participated in this particular fund. Conceding ERISA standing, defendants have moved for summary judgment contending that plaintiffs lack Article III standing to bring such claim.

Early in this action, this court determined that participants suing under ERISA have the burden of showing that they personally suffered some actual or threatened injury as a result of the allegedly unlawful conduct complained of under ERISA. David v. Alphin, 2008 WL 5244483, at *5-8 (W.D.N.C. July 23, 2008). In pertinent part, Judge Howell held, as follows:

> Plaintiffs who assert claims under ERISA not only must satisfy the statutory standing requirements of ERISA § 502(a), they also must establish standing under Article III of the United States Constitution. Plaintiffs' argument that the "common law" cannot trump standing provided by Congress in ERISA is unavailing inasmuch as Article III or "constitutional standing" is

-29-

a threshold issue in every case. *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998); *Bennett v. Spear*, 520 U.S. 154 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). The Supreme Court has been clear on the point:

> Article III of the Constitution limits the power of federal courts to deciding "cases" and "controversies." This requirement ensures the presence of the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements. This Court consistently has required, in addition, that the party seeking judicial resolution of a dispute "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct" of the other party. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *see also Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).
>
> The nature of the injury is central to the Art. III inquiry, because standing also reflects a due regard for the autonomy of those most likely to be affected by a judicial decision. "The exercise of judicial power ... can so profoundly affect the lives, liberty, and property of those to whom it extends," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982), that the decision to seek review must be placed "in the hands of those who have a direct stake in the outcome." *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972). It is not to be placed in the hands of "concerned bystanders," who will use it simply as a "vehicle for the vindication of value interests." *United States v. SCRAP*, 412 U .S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

*Diamond v. Charles*, 476 U.S. 54, 61-62 (1986). *See Wilmington Shipping Co. v. New Eng. Life Ins. Co.*, 496 F.3d 326 (4th Cir.2007).

Under prevailing case law, plaintiffs must plead and prove that they

have suffered an injury that will "likely" be redressed by a favorable outcome in the litigation. *Lujan, supra*, at 560-62. Plaintiffs cannot satisfy that threshold requirement as to their claims against the Pension Plan.

Id., at **5-6. Not only is such decision "law of the case,"[14] such determination remains consistent with prevailing law. Further, independent review of such issue by the undersigned leads this court to the same conclusion.

As to Count V, plaintiffs lack standing under Article III of the United States Constitution because they have not shown that they have "personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct" of the defendants. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979). Summary judgment will be granted and such Count will, therefore, be dismissed for lack of Article III standing.

## C.     Count VII

In addition to the allegations discussed earlier concerning the allegedly fraudulent documents, plaintiffs allege in Count VII that those same documents support an independent breach of fiduciary duty claim based on misrepresentation. Unlike the initial selection claims and their analogues, this new breach of fiduciary duty claim is based on conduct that occurred after selection but before the statute of repose would other prohibit its litigation.

This claim was, however, brought for the first time in 2010 and concerns conduct of persons not named in the original Complaint that allegedly occurred more than six years before November 19, 2010. In order for this claim to not be barred under the statute of

---

[14]     Such recommendation was adopted by Honorable Robert J. Conrad, Jr., United States District Judge. See David v. Alphin, 2008 WL 5244504 (W.D.N.C. Dec. 15, 2008), *motion to certify appeal denied*, David v. Alphin, 2009 WL 3633889 (W.D.N.C. Oct. 30, 2009).

-31-

repose, 29 U.S.C. § 1113(1), plaintiffs must show that such claim properly relates back to the filing of the original Complaint in 2006.

In conducting such review, the court has first considered the language of Rule 15(c), which provides in relevant part as follows:

> **(c) Relation Back of Amendments.**
> > **(1) When an Amendment Relates Back.**
> > An amendment to a pleading relates back to the date of the original pleading when:
> >
> > * * *
> >
> > (B)    the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading
> >
> > * * *

Fed.R.Civ.P. 15(c)(1). In applying Rule 15(c), a trial court must first determine whether a factual nexus exists between the amendment to the Complaint and the original Complaint.

Grattan v. Burnett, 710 F.2d 160, 163 (4th Cir.1983). If such a nexus exists, the

> amended claim is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment.

Id. Consistent with its decision in Grattan, the Court of Appeals for the Fourth Circuit later held that the "relation back" doctrine does not apply where a new claim challenges events that are separated by "time and type," from those addressed in the original complaint.

United States v. Pittman, 209 F.3d 314, 318 (4th Cir. 2000) ("new claims do not relate back to [the] original claims because they arise from separate occurrences of 'both time and type'") (citation omitted).

Review of the amendments in comparison with the original Complaint reveals no

-32-

reference in the original Complaint to any of the communications forming the basis of Count VII. Further, it is undisputed that the communications underlying Count VII were prepared by persons other than those who selected the funds at issue in the original Complaint and at different times. Further, Count VII concerns a distinct transaction from those asserted in the original Complaint.

Based on such threshold review, the court finds no nexus as Count VII challenges actions that are separated by "time and type" from those addressed in the original complaint by persons other than those whose conduct is challenged in the original Complaint. Further, plaintiffs' contention that they did not discover such claim earlier based on "fraud or concealment" carries no further than it did as to Count IV inasmuch as plaintiffs have failed to present any evidence that anyone intended to deceive Plan participants. Defendants' Motion for Summary Judgment will be granted as to this claim as, without relation back, this claim is also time barred.

### D.    Count VI

In Count VI, plaintiffs contend that the bank concealed the committee defendants' alleged fiduciary breach in the selection of bank affiliated funds and that it is therefore liable as a co-fiduciary for the committee defendants' conduct. TAC ¶¶ 145-45. For the reasons discussed in relationship to Count VII, and this claim is also untimely for the same reasons.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendants' Motion for Summary Judgment is **GRANTED,** and this action is **DISMISSED** in its entirety with prejudice for the reasons

discussed above. The Clerk of this Court is respectfully instructed to enter Judgment consistent with this Memorandum of Decision and Order.

**The Clerk of this court is respectfully instructed to send a hard copy of this Memorandum of Decision to Judge Howell.**

Signed: September 22, 2011

Max O. Cogburn Jr.
United States District Judge